Filed 4/23/14  P. v. Brown CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B242118 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA089671) |
| v. | |
| LAMAR BROWN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark C. Kim, Judge.  Affirmed as modified.

Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey and David Zarmi, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Lamar Brown, appeals his convictions for corporal injury to a cohabitant, and assault by means of force likely to produce great bodily injury, with great bodily injury and prior serious felony conviction findings (Pen. Code, §§ 273.5, (former) 245, subd. (a)(1), 12022.7, 667, subds. (a)-(i)).[1] Brown was sentenced to state prison for a term of 34 years to life.

The judgment is affirmed as modified.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

Denesha C. and defendant Brown had been romantically involved on-and-off since junior high school. In 2010, Brown began living with Denesha and her three children in an apartment on Redondo Avenue in Long Beach. In January 2011,[2] they moved into an apartment on Junipero Avenue. Brown moved out in February following an argument with Denesha. When Brown, accompanied by his friend, Fred Mims, came by the apartment to pick up some belongings, there was a physical altercation. Brown pushed Denesha down onto the bed while choking her. He also bit the inside of her lip. Denesha, who was pregnant with Brown's child at the time, did not call the police. They reconciled shortly afterward and Brown moved back in.

On July 31, Brown asked Denesha to come with him to a party at his mother's house. Denesha said she was tired, so Brown went by himself. When he returned later that night, Brown brought some food with him and he woke Denesha up to help him put it away in the refrigerator. Brown was drunk and angry because he had had a fight with his mother. He and Denesha argued about fitting the food into the refrigerator. To calm things down, Denesha went into the living room and sat on the couch.

---

[1]     All further references are to the Penal Code unless otherwise specified.

[2]     All further date references are to the year 2011 unless otherwise specified.

Brown came in and continued to argue. Then he headbutted Denesha in the nose and hit her in the face. Denesha could not remember anything after that and believed she had been knocked unconscious.

The next thing Denesha recalled was feeling pain in her face and realizing she was bleeding. Brown told her to call the police. He was crying and apologetic, and he said "Don't let me get away with what I did." The tape of Denesha's 911 call was played for the jury. Denesha, who can be heard sobbing, told the operator Brown had hurt her and that her nose was bleeding. In the background, Brown can be heard telling Denesha: "[Y]ou're not gonna say nothing.'" Although Brown told Denesha he was going to wait for the police to arrive, he left as soon as they heard a siren.

Officer Alvino Herrera responded to Denesha's 911 call. Upon arriving outside the apartment building, he saw Brown walking away hurriedly and arrested him. After booking him at the police station, Herrera noticed blood spatter on Brown's shoes.

Officer Kenneth Green made contact with Denesha when she came to open the apartment gate for the police. She was crying hysterically, hyperventilating, vomiting and unable to communicate. Her face was bleeding profusely. Green took her back to the apartment to wait for the paramedics. As she was being treated, Denesha told Green that Brown had headbutted her and punched her in the face and head. She could not remember exactly how many times she had been punched because she "was extremely dazed and in a lot of pain." Denesha told Green "that in the past [Brown] threatened to kill her during times when he was upset at her" and "as a result of what had happened, she was in fear for her life." Denesha wanted Brown prosecuted, so Green gave her "temporary restraining order information." Green took Denesha to the emergency room at Community Hospital Long Beach.

At the hospital, Denesha told Detective Rubi Castro that she had been head butted. Because she was dazed, she could not "recall if she was either punched or slapped," but she definitely remembered being hit in the head.

Denesha was treated in the emergency room by Dr. Charles O'Brien. She told him she had been punched multiple times in the face, but that she had not lost

3

consciousness. A CAT scan showed multiple fractures to her nasal bones, cheek bone, and "orbital wall or eye socket." O'Brien explained how much force had been required to cause these injuries: "To break someone's orbital or eye socket and maxillary bone, it takes at least 50 G's of force[3]. . . . [I]t's like dropping . . . a 50-pound weight on someone's face" from a distance of a foot or two. Given the severity of Denesha's facial fractures and the varied locations of her injuries, O'Brien opined "it would be more than one head butt, not just one head butt." He also testified: "[A] head butt is such a broad area that to get the nose and this area (indicating), I don't imagine a head butt causing this. It's . . . more consistent with a fist in my opinion." "Q. And it's your testimony that one blow to the face could not have caused . . . the injuries? Is it likely? [¶] A. It's unlikely." O'Brien testified Denesha said "she was struck with a fist multiple times" which, he opined, "was consistent with her injuries."

2. *Defense evidence.*

Frederick Mims testified he had gone to high school with Brown. They were such close friends they called each other "cousin." When Mims helped Brown move some of his belongings out of the Junipero Avenue apartment, he did not see Denesha crying or any blood on her face. Brown and Denesha were smiling and they kissed each other when Brown and Mims departed.

Brown testified in his own defense. Denesha had been his girlfriend on and off since he was 14. Their relationship became more serious in 2009, when he was in his early 30's. He acted as a father toward Denesha's children, even though they were not his, and they called him "Pops." Brown testified he had never been violent with Denesha and that her contrary testimony was a lie.

Brown moved his things out of the Junipero apartment a few weeks after moving in because he and Denesha were fighting about his philandering. He denied

[3]    O'Brien testified: "[T]hat's [a] conservative estimate. It's been documented that for the maxillary bone, it could be 50 to 100 G's of force."

4

pushing her onto the bed, choking her, or biting her lip. After he drove away with Mims, Denesha called and asked him to move back in, which he did a few days later. On July 29, Denesha accused him of cheating on her again because he smelled of perfume. Brown testified Denesha was right; he had been cheating. She warned him that if he broke her heart he would "lose everything."

On the morning of July 31, Denesha refused to attend the party at his mother's house, so he went alone. When he returned home at 11:00 p.m., Denesha was upset because he was late. She complained he hadn't put the food into the refrigerator correctly, saying: "You always do this dumb shit." They argued. When Denesha smelled perfume on Brown's shirt, she accused him of cheating again. This time it wasn't true and Brown denied it. Denesha was sitting on the couch. Brown knelt or crouched down in front of her, put his hands on her knees, and told her he had not cheated. They continued to argue. Finally, Brown said he had cheated on her, not because it was true but only because he was tired of arguing.

At this point, Denesha started to get up from the couch, which caused Brown to stand up quickly in order to avoid being knocked over. This resulted in a collision during which Brown accidentally headbutted Denesha, who fell back onto the couch, unconscious. When she came to, Brown apologized but Denesha "started ranting and raving," saying "You fucked up. I told you. You going to lose everything." Brown told her to call 911 because she was injured. To stop the bleeding, he put a shirt on her nose and then a towel. He left before the police arrived because he didn't want them to scare the children by coming into the apartment to arrest him.

## CONTENTIONS

1. Brown's convictions must be reversed because there was pervasive prosecutorial misconduct.

2. The trial court erred by denying Brown's *Romero* motion to dismiss a Three Strikes prior.

3. Brown is entitled to additional presentence custody credits.

5

4.  [By the Attorney General]  The abstract of judgment contains a clerical error.

## DISCUSSION

1.  *There was no prosecutorial misconduct.*

Brown contends his convictions must be reversed because the prosecutor engaged in misconduct in order to vilify him and bolster Denesha's credibility. Brown argues:  "While each instance of misconduct by itself would not be cause for reversal, the cumulative effect of all the misconduct requires reversal because it infected the trial with such [un]fairness [as] to render the resulting convictions a denial of due process."[4]  This claim is meritless.

a.  *Legal principles.*

As we have said:

" 'Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.]  Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights – such as a comment upon the defendant's invocation of the right to remain silent – but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action " 'so infected the trial with unfairness as to make the resulting conviction a denial of due

---

[4]    Despite Brown's assertion the prosecutorial misconduct was "sometimes aided by erroneous court rulings," he never actually makes any claims of trial court error in his opening brief.  Brown cannot properly use his reply brief to broaden the contentions made in his opening brief.  "Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief.  [Citation.]" (*People v. King* (1991) 1 Cal.App.4th 288, 297, fn. 12; see *People v. Newton* (2007) 155 Cal.App.4th 1000, 1005 ["we do not consider an argument first raised in a reply brief, absent a showing why the argument could not have been made earlier"]; *Moore v. Shaw* (2004) 116 Cal.App.4th 182, 200, fn. 10 ["Ordinarily, an appellant's failure to raise an issue in its opening brief waives the issue on appeal.].)

6

process.' " [Citations.] [¶] . . . [¶] ' " '[T]he prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom' " [citation.] . . . .' (*People v. Welch* (1999) 20 Cal.4th 701 . . . .) 'When we review a claim of prosecutorial remarks constituting misconduct, we examine whether there is a reasonable likelihood that the jury would have understood the remark to cause the mischief complained of. [Citation.]' (*People v. Osband* (1996) 13 Cal.4th 622, 689 . . . .) 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' [Citation.]" (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1402-1403.)

      b. *Denesha's testimony revealing Brown had been incarcerated.*

Brown contends the prosecutor committed misconduct by eliciting Denesha's testimony that she did not report the February incident because she did not want him sent back to jail for a parole violation. Brown argues: "This was the first incident in the prosecutor's design to show that appellant was such a bad person, a person so violent and callous, his version of an accident could not be believed."

Brown had sustained prior felony convictions for attempted murder and attempted robbery. The trial court ruled the prosecution could refer to these priors, but only in a sanitized way by saying Brown had been in prison without specifying the nature of his crimes. The trial court also ruled the prosecutor could show Brown was on parole at the time of the February incident. Based on these rulings, the prosecutor told the jury during opening statement that "for a longtime, [Brown] was incarcerated and . . . when he got out" he and Denesha moved in together. When the February incident occurred, Denesha "didn't call the police because she didn't want him to face the repercussions, having just gotten out of prison." Defense counsel did not object to these statements.

7

When Denesha testified, the prosecutor asked why she hadn't called the police in February. Denesha replied, "Because I just chose not to." The prosecutor asked why she had chosen not to, and Denesha said: "Trying to keep him from being in trouble." The prosecutor then asked, "What do you mean?" and Denesha said "Get him back in jail."

Brown argues: "Because the prosecutor could not get Denesha to say what he wanted her to say, that is she did not want appellant to be violated on parole, he repeatedly attempted to elicit this response from her, underscoring what jurors probably already knew – appellant was in prison for a long time for something serious, he just got out and was on parole."

We cannot see any prosecutorial misconduct here. The trial court had ruled the prosecutor could mention Brown's prison incarceration and the fact he was on parole. The prosecutor's questions did not go further.

      c. *Testimony about Denesha's miscarriage.*

      (1) *Background.*

After Denesha described the February incident and explained why she had not reported Brown to the police, the following colloquy occurred:

"[Prosecutor]: Can I approach sidebar just for one question?

"The Court: No.

"[Prosecutor]: After this first incident . . . what happened to your pregnancy?

"[Defense counsel]: Objection; relevance.

"[Denesha]: I miscarried.

"The Court: Hold on. Hold on. Sustained.

"[Defense counsel]: I'm sorry. Motion to strike her answer, Your Honor.

"The Court: If she gave an answer, that answer is stricken. [¶] Ladies and gentlemen, if I strike the answer, you are to act as though you had not heard it. [¶] Next question.

"[Prosecutor]: [Y]ou were pregnant you said during the [February 2011] incident, correct?

8

"[Defense counsel]: Your Honor, I'm going to object to this line of questioning, and it also –

"The Court: Can I see both parties at sidebar?"

At sidebar, the prosecutor explained Denesha had miscarried two weeks after the February incident, but subsequently became pregnant with Brown's child a second time. The prosecutor argued this miscarriage information was relevant to clarify there had been two separate pregnancies and that Denesha was not claiming she had been pregnant for 11 or 12 months.

The trial court responded by asking if defense counsel would stipulate Denesha was now (i.e., in January 2012) pregnant with Brown's child. Defense counsel agreed. But when the prosecutor argued the stipulation should also state Denesha was now seven months pregnant and that she had also been pregnant in February 2011, the trial court accused the prosecutor of trying to show Denesha's miscarriage had been caused by the February incident. When the prosecutor said he had no such medical evidence, the court ruled the miscarriage information would be too inflammatory because the jury might assume causation. When the prosecutor reiterated his desire to "clarify the pregnancy timing," the following colloquy occurred:

"The Court: She's going to stipulate that the child she is bearing at this point is, in fact, defendant's child. What more do you need?

"[The prosecutor]: I need the fact.

"The Court: The only thing that you need is for the elements of [Penal Code section] 273.5 [corporal injury on cohabitant] that either the defendant and the victim was cohabitant [*sic*], they were married, or they have a child.

"[The prosecutor]: I understand, but the only thing I'm saying is it would make it that she'd be 11 months pregnant or 12 months pregnant if she –

"The Court: I've made my ruling.

"[The prosecutor]: It goes to her credibility that she's said – can I ask her if she's seven months pregnant?

"The Court: She's already said that."

9

When the prosecutor subsequently asked Denesha for her due date, she said it was March 18, 2012. The trial court overruled defense counsel's relevance objection.

(2) *Discussion*.

Brown contends: "The prosecutor, knowing that he had no evidence to back up his claim smuggled in evidence that Denesha had a miscarriage due to appellant's prior misconduct. The prosecutor committed serious misconduct as part of his pattern of character assassination of appellant."

We disagree. The fact Denesha had been pregnant with Brown's child in February 2011 helped explain why she did not report his assault to the police. Yet, as the Attorney General notes, this evidence "left her credibility damaged in one crucial aspect: how could Denesha be seven months pregnant during trial if she first became pregnant a year earlier in January 2011? Although the prosecutor tried to explain his position to the court, it does not appear that he ever succeeded and [he] ultimately agreed to a stipulation that did not completely solve the credibility issue. The jury was not allowed to hear testimony that there had been two pregnancies." Although the prosecutor may have been overly cautious in wanting to protect Denesha's credibility, his attempt to prevent jurors from concluding she was making the impossible assertion she had been pregnant for 12 months did not constitute prosecutorial misconduct.

d. *Using the word "strangled" and referring to a "protective order"*

While questioning Officer Castro, the prosecutor used the word "strangled" in connection with the February incident, and asked if Denesha had indicated an interest in obtaining a protective order. Brown complains this was part of the prosecutor's attempt to vilify him.

(1) *Background*.

While questioning Castro about her interactions with Denesha on the night of the July incident, the prosecutor asked whether Denesha had mentioned an earlier incident "where she was strangled." Castro answered yes and defense counsel objected on relevance grounds. The trial court sustained the objection "based on the form of the question." The prosecutor then asked, "Did she complain to you about

10

another incident that had occurred a few months prior to this one?"  Castro said yes. The prosecutor then asked, "[W]hat was her position on having a protective order done?"  Defense counsel objected on relevance grounds and the trial court ordered the parties to sidebar.  The prosecutor explained he was only trying to show Denesha wanted a protective order when the July incident occurred, which was relevant to rebut defense counsel's inferences Denesha was lying when she said Brown had purposely injured her.  The court sustained the defense objection.

(2)  *Discussion*.

Brown claims the prosecutor's references to strangulation and a protective order were designed to vilify him by suggesting he tried to murder Denesha during the February incident.  Brown complains the prosecutor left "the jury with the impression that the prior incident was not just a choking, [but that] appellant strangled Denesha, i.e., he tried to choke her to death. . . .  [However,] there was no evidence that appellant tried to kill Denesha by strangulation in the past."

In our research we have found the terms "choking" and "strangulation" used pretty much interchangeably.  (See, e.g., *People v. Morgan* (2007) 42 Cal.4th 593, 601 ["Bleeding in her neck muscles and hemorrhages in her eyes revealed that Wong had been strangled or choked and had experienced asphyxiation for a period of time."]; *People v. Cole* (2004) 33 Cal.4th 1158, 1193 [officer testified victim "had a bruise under her right eye and red welts around her neck, which were consistent with having been choked or strangled"]; *People v. Price* (2004) 120 Cal.App.4th 224, 230 [victim told police defendant "slapped her, straddled her, pinned her down and – placing two hands around her throat – began strangling her.  [She] feared she would lose consciousness."].)

Denesha's own description of the February incident included this exchange:

"A.  He choked me on the bed.

"Q.  How did you get on the bed?

"A.  He started choking me when he was standing up and then I fell back on the bed.

11

"Q. Did it stop your breathing for a period of time?

"A. Yes, it did."

As to the prosecutor's question about whether Denesha exhibited interest in a protective order when she spoke with Officer Castro at the hospital following the July incident, it is apparent the prosecutor was trying in good faith to rebut defense counsel's suggestion Denesha had been lying about Brown's purposely injuring her. Denesha's interest in a protective order would have gone to show she really had been frightened of Brown that night.

This did not constitute prosecutorial misconduct.

e. *Argumentative and repetitive questions during cross-examination of Brown.*

Brown contends the prosecutor committed misconduct by asking him repetitive and argumentative questions during cross-examination.

(1) *Background.*

Defense counsel elicited Denesha's testimony that, after assaulting her, Brown told her to call the police. During his cross-examination of Brown, the prosecutor sought to undermine the implication Brown never entertained any second thoughts about having told Denesha to call the police. The following colloquy occurred:

"Q. And you helped her to the extent you could with the – from the bathroom and the towels and stuff?

"A. Yes.

"Q. Oh, I bet you were happy she was calling 9-1-1, right?

"[Defense counsel]: Objection; argumentative.

"The Court: Sustained. Rephrase.

"Q. By [the prosecutor]: Were you happy that she was calling 9-1-1?

"[Defense counsel]: Objection; argumentative.

"The Court: Sustained.

"Q. By [the prosecutor]: Did you ask her to call 9-1-1?

"A. Yes, I did."

12

Later, the prosecutor asked why Brown left the apartment during the 911 call. Brown replied:

"A.  I left so that the police wouldn't come up in the house and startle the kids. The kids were in the bedroom asleep.  I walked out of the house so the police couldn't come up in there.

"Q.  So you have children sleeping and a girlfriend bleeding and you decide to leave?

"A.  I walked out so that the police wouldn't come up in there and startle the kids.

"Q.  And you felt startling the kids was more important than being there with your loved one who is bleeding waiting for help?

"[Defense counsel]:  Objection; that's argumentative.

"The Court:  Overruled."

When Brown said he hadn't thought about it at the time, the prosecutor asked:

"[Q.]  Why didn't the person who is called Daddy by the kids go in and lay with the kids then to comfort them."

"[Defense counsel]:  Objection; it's argumentative.  It's confusing, vague.

"The Court:  Sustained.  [¶]  Rephrase the question.

"Q.  By [the prosecutor]:  Why didn't you go to the kids?

"A.  The kids were asleep.

"Q.  Wouldn't you want to be there if they were woken up?  Wouldn't that be more important?

"[Defense counsel]:  Objection; that's argumentative.

"The Court:  Overruled.

"The Defendant:  I wouldn't want the kids to watch me go to jail."

The prosecutor asked Brown a series of questions about whether he left the apartment because he thought Denesha was going to lie to the police about what happened.  For instance:

"Q.  . . .  What did you think that she was going to say?

13

"A. I don't know what she was going to say. I stepped out the house so that the police wouldn't come up into the house and scare the kids.

"Q. Isn't it true you left because she was about to talk to the police? Isn't that why you left?

"A. No, it's not.

"Q. But it's in your mind, you believe she's going to falsely accuse you of something?

"A. I didn't know what she was going to do. I stepped out the house so the police wouldn't come up in there and scare the kids.

. . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . .

"Q. By [the prosecutor]: In your mind, when you're exiting that door, did you have any thoughts whatsoever of what she may or may not say to the police regarding your behavior?

"A. No.

"Q. Okay. Did . . . it cross your mind that she might not tell the police the truth about what happened to her head?

"A. I never thought about what she was going to say to the police."

At sidebar, the prosecutor explained he was trying to establish Brown had been aware Denesha was going to accuse him of injuring her. After noting Brown had already testified he did not know what Denesha was going to say, the court ordered the prosecutor to move on.

The prosecutor played the 911 recording and asked Brown what he had been saying in the background that contained the word "not" repeated three times. Brown acknowledged he could hear himself saying the word "not" on the tape, but testified he could not recall the context. He denied telling Denesha not to say anything. The 911 recording was played again and the prosecutor asked:

"[Q.] Did you just hear that tape saying, 'You're not gonna say nothing'? Did you hear that?

14

"A. I can't understand what it's saying. All you hear is her in the background.

"Q. You didn't hear yourself saying that?

"A. I heard a voice. I mean, you said it's my voice, but I . . . heard the voice, if that's supposedly me. I mean . . . you can't understand what it's saying.

"Q. Was there anybody else there calling 9-1-1?

"A. That's why I said it had to be me.

"Q. Okay. And you . . . couldn't understand anything on that tape?

"A. No, sir.

"Q. Okay. And . . . you did not say, 'You're not gonna – you're not gonna say nothing. You got nothing on me'? You didn't say that?

"A. No, sir."

(2) *Discussion.*

Brown contends the prosecutor committed misconduct by repeatedly asking why he left the apartment before the police arrived, whether he thought Denesha was going to lie to the police, and what he said on the 911 tape. The Attorney General argues the prosecutor's questions were legitimate attempts to impeach Brown's implausible story that, although Denesha had been injured accidentally, he left her bleeding in the apartment in order to evade the police solely to protect the children from being startled. We agree with the Attorney General.

"Once a defendant takes the stand and testifies to the circumstances of the charged offenses, the prosecutor on cross-examination is permitted 'to explore the identical subject matter in much greater detail.' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 754.) "[T]he permissible scope of cross-examination [of a testifying defendant] is 'very wide.' " (*People v. Cooper* (1991) 53 Cal.3d 771, 822.) "[B]y choosing to testify, defendant put his own veracity in issue." (*People v. Tafoya* (2007) 42 Cal.4th 147, 179.) "The prosecutor is entitled to attempt to impeach the credibility of a defendant's testimony [citation] and . . . [w]hen a defendant chooses to testify concerning the charged crimes, the prosecutor can probe the testimony in detail and

15

the scope of cross-examination is very broad." (*People v. Dykes* (2009) 46 Cal.4th 731, 764.)

Because sarcasm and other rhetorical devices may highlight for the jury the improbability of a defendant's testimony, their use in cross-examination is not necessarily improper. (See, e.g., *People v. Guerra* (2006) 37 Cal.4th 1067, 1128, disapproved on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151 [prosecutor asked defendant "Are you just making this up as you go along?"].)

Here, the prosecutor's questioning was zealous, but we cannot say it amounted to misconduct.

### f. *Improper closing argument.*

#### (1) *Reference to Denesha's preliminary hearing testimony.*

The prosecutor argued to the jury that, although Denesha had made statements to two different police officers, testified at the preliminary hearing, and then testified at trial, the defense had been unable to find any significant contradictions in her statements or testimony. Defense counsel objected to the preliminary hearing reference on the ground this testimony had not been admitted at trial. The court admonished the jury they could only consider evidence that had been introduced at trial. The court then admonished the prosecutor, saying: "So stick to the evidence, please." The prosecutor immediately reminded the jury, without any objection from defense counsel, that Denesha testified she had given evidence at the preliminary hearing.

This did not constitute prosecutorial misconduct. "[A] prosecutor may comment on the state of the evidence, including the failure of the defense to introduce material evidence or to call witnesses." (*People v. Mincey* (1992) 2 Cal.4th 408, 446.) "A prosecutor may fairly comment on and argue any reasonable inferences from the evidence. [Citation.] Comments on the state of the evidence or on the defense's failure to call logical witnesses, introduce material evidence, or rebut the People's case are generally permissible. [Citation.] However, a prosecutor may not suggest that 'a

16

defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.' [Citations.]" (*People v. Woods* (2006) 146 Cal.App.4th 106, 112.)

Here, there was no misconduct. The prosecutor was merely pointing out that if Denesha had made contradictory statements, whether to the police or when she testified at the preliminary hearing, Brown would have pounced on those inconsistencies during trial. It was permissible to comment on Brown's failure to produce logical evidence that would have discredited Denesha's testimony.

(2) *References to implausible defense theories*.

Brown contends the following comments by the prosecutor attacking various aspects of the defense amounted to prosecutorial misconduct. This claim is meritless.

(a) *"You have to create an accident."*

The prosecutor argued the defense, faced with overwhelming evidence that Denesha's injuries had been intentional, "need[ed] to discredit the victim. You've got to make her into a liar, and you've got to have a motive to lie. That's one way to try to defend the case. Additionally, you have to explain away the injuries. And lastly, you have to create an accident, which is a defense to the case."

(b) *"Scenario created is an accidental touching"*

The prosecutor argued that, although the defense claimed Denesha and Brown had been fighting about his philandering, defense counsel never challenged Denesha's testimony there had been only a silly argument about storing food in the refrigerator. The prosecutor suggested the defense strategy had instead been to steer the jury toward Brown's accident testimony: "The argument wasn't about cheating. That's what she said. They discussed that before, that argument that night wasn't about cheating. That's what she says and never confronted otherwise. [¶] Explain away the injuries. Well, to explain away the injuries. It has to be accident. That's the only way to defend a case with such significant injuries. . . . The scenario created is an accidental touching of the heads."

17

(c) *"Under the concocted scenario"*

The prosecutor argued Brown's version of the incident was unbelievable. Brown testified that two days earlier, when Denesha accused him of being unfaithful, he acknowledged he had been. Brown also testified he came home two nights later again smelling of perfume but this time he had not been unfaithful, although he falsely admitted to cheating because he was tired of arguing. The prosecutor told the jury: "He wants you to think that he's going to lose everything if he's caught cheating again, yet . . . he's willing to go out late, come back and has perfume on his jacket three days later. Then he's in front of her with his hand on her leg and she's saying, 'Have you cheated? Have you cheated?' Knowing I'm going to lose everything and saying, okay, I'm going to admit. I'm going to lose everything. Yes, I cheated again. No way in heck I suggest to you would someone under the concocted scenario to give her motive[5] would ever be in that situation." The trial court overruled defense counsel's objection to prosecutorial misconduct.

(d) *Accusing defense counsel of asking Mims leading questions.*

The prosecutor attacked Mims's account of the February incident by questioning his credibility, arguing there were inconsistencies in his testimony, pointing out he was such a close friend of Brown they called each other "cousin," and suggesting he had been guided by defense counsel's leading questions when he testified Denesha and Brown had been amorous with each other that day.

As to the latter issue, Mims testified as follows:

"Q. Did you see Mr. Brown showing any type of affection to Denesha while he was there?

"A. Yes, I did.

"Q. What did you see?

"A. Smiling, idle chatter. There wasn't no – I'm sorry. Go ahead.

---

[5] This was an apparent reference to defense counsel's argument Denesha was lying about what happened because she wanted revenge for Brown's philandering.

18

"Q. Did they embrace each other or kiss each other?

"[The prosecutor]: Objection; leading.

"The Court: Sustained. Rephrase the question.

"[Defense counsel]: Thank you, Your Honor.

"Q. Did you see . . . them sharing any affection towards each other?

"A. Well, when we finished putting the things in the car, she told me, 'Okay, Fred. Nice knowing you.' And he said, 'It's not like that. Don't be like that,' and he went to hug her. He hugged her and kind of like kissed her on the cheek, and she was like, 'Oh, Lamar.' And it wasn't like it was a don't do it or you shouldn't have did it or anything like that."

Again outside the jury's presence, defense counsel complained the prosecutor was in essence accusing her of having fabricated the defense by signaling her desired answers while examining Mims, and by colluding with Brown to come up with the accident story. Defense counsel objected on the ground of improper argument and asked for a curative instruction. The trial court said its interpretation of the prosecutor's remarks was different: the prosecutor was simply arguing that Brown's "testimony about the injuries being caused by one minor head butt was not credible," and that Mims's testimony was not credible because it was inconsistent and he was so personally close to Brown.

During closing argument, the prosecutor commented on this testimony: "[Mims's] exact quote on what was the romantic contact . . . I don't have the question, but he goes, 'Oh, they just smiled and had idle chat.' That's what he said. Now, [defense counsel] says, 'Were they . . . kissing?' 'Oh, yeah. They were kissing.' Well, was it a kiss? Well, kind of. . . . I suggest to you the way that whole thing came down and trying to fit in the defense and the questions . . . that led to the answers would cause some suspicion."

(e) *Discussion*.

"Although counsel have broad discretion in discussing the legal and factual merits of a case [citation], it is improper to misstate the law [citation] or to resort to personal attacks on the integrity of opposing counsel [citation]." (*People v. Bell* (1989) 49 Cal.3d 502, 538.) "If there is a reasonable likelihood that the jury would understand the prosecutor's statements as an assertion that defense counsel sought to deceive the jury, misconduct would be established." (See *People v. Cummings* (1993) 4 Cal.4th 1233, 1302.) On the other hand, "[a]n argument which does no more than point out that the defense is attempting to confuse the issues and urges the jury to focus on what the prosecution believes is the relevant evidence is not improper." (*Id*. at p. 1302, fn. 47.)

We do not agree the jury would have believed the prosecutor was claiming defense counsel had colluded in the creation of false testimony. Rather, the jury would have realized the prosecutor's comments were mere hyperbole meant to cast doubt on Brown's version of events.

Two cases relied on by Brown to demonstrate prejudicial misconduct are simply inapposite. In *People v. Bain* (1971) 5 Cal.3d 839, the prosecutor implied defense counsel had coached the defendant to lie. During closing argument, the prosecutor said: " 'You might say to yourself, "The defendant's got a good story." Did you think he was going to come in here without a good story? He's had how long to prepare . . . . I don't want to imply that my colleague here, that he told him what to say, but he has the assistance of a lawyer.' " (*Id.* at p. 845.) *Bain* held this constituted misconduct: "The unsupported implication by the prosecutor that defense counsel fabricated a defense constitutes misconduct." (*Id.* at p. 847.)

In *People v. Herring* (1993) 20 Cal.App.4th 1066, the prosecutor implied defense counsel had suborned perjury by instructing the defendant to invent a consent defense to a rape charge. "The prosecutor's comments, i.e, '[m]y people are victims. His people are rapists, murderers, robbers, child molesters. He has to tell them what to say. He has to help them plan a defense. He does not want you to hear the truth,'

20

were clearly improper and misconduct. His argument inferred that all those accused of crimes whom defense counsel represented are necessarily guilty of heinous crimes. Additionally, he impliedly denigrated the presumption of innocence and the requirement that guilt be proved beyond a reasonable doubt. More egregious, he inferred that defense counsel suborned perjury. It is improper for the prosecutor to imply that defense counsel has fabricated evidence or to otherwise malign defense counsel's character. [Citations.]" (*Id.* at p. 1075.) "The prosecutor's comments accused defense counsel of fabricating a defense [and] implied that appellant lied on instructions from his counsel . . . ." (*Id.* at p. 1077.)

As *People v. Gionis* (1995) 9 Cal.4th 1196, explained: "[B]oth of those cases reflected extreme instances of prosecutorial misconduct. In [*Herring*] . . . the [prosecutor's] argument [in effect] accused defense counsel of suborning perjury and implied that defense counsel did not believe his own client. It also implied that all those accused of crimes whom defense counsel represented were necessarily guilty of heinous crimes. [Citation.] Similarly, in [*Bain*] the prosecutor not only asserted that defendant and his counsel had fabricated a defense, but he also attacked the integrity of counsel and the office of the public defender. Additionally, the prosecutor referred repeatedly to racial matters, stating at one point that he, as a Black man, would not be prosecuting a Black defendant unless he personally believed the man to be guilty. [Citation.]" (*Id.* at pp. 1220-1221.)

The prosecution's closing argument here was nothing like what happened in *Bain* and *Herring.* The prosecutor's statements were not likely to have been heard by the jury as a claim defense counsel had instructed Brown or any other witness to lie. Rather, those statement were likely interpreted as "an admonition not to be misled by the defense interpretation of the evidence, rather than as a personal attack on defense counsel." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1002, 1003 [referring to prosecutor's permissible argument that defense counsel's " 'job is to create straw men. Their job is to put up smoke, red herrings. And they have done a heck of a good job. And my job is to straighten that out and show you where the truth lies. . . .' "]; see also

*People v. Turner* (2004) 34 Cal.4th 406, 430 [" 'The prosecutor is permitted to urge, in colorful terms, that defense witnesses are not entitled to credence [and] to argue on the basis of inference from the evidence that a defense is fabricated . . . .' [Citation.]"].)

We have not specifically addressed herein every single instance of alleged prosecutorial misconduct, although we have reviewed them all. These include claims the prosecutor took unfair advantage of favorable court rulings, mischaracterized evidence, and tried to steer the jury away from requesting readbacks of testimony. We have reviewed each allegation and conclude that, whether considered individually or collectively, they did not constitute prosecutorial misconduct. They did not involve the use of deceptive or reprehensible methods and, given the overwhelming evidence showing Denesha's injuries had not been caused accidentally, it is not reasonably probable Brown would have achieved a more favorable outcome in their absence. (*People v. Spector, supra,* 194 Cal.App.4th at pp. 1402-1403.) Nor did they so infect the trial with unfairness that due process was violated. (*Ibid*.)

2. *Romero motion was properly denied.*

Brown contends the trial court abused its discretion by refusing to dismiss, under the authority of *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, one of the prior convictions used to impose a Three Strikes sentence. This claim is meritless.

a. *Legal principles.*

The factors to be considered in ruling on a *Romero* motion were set forth in *People v. Williams* (1998) 17 Cal.4th 148, 161: "[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law . . . 'in furtherance of justice' pursuant to Penal Code section 1385(a), or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence

22

should be treated as though he had not previously been convicted of one or more serious and/or violent felonies."

"[A] trial court's refusal or failure to dismiss or strike a prior conviction allegation under section 1385 is subject to review for abuse of discretion." (*People v. Carmony* (2004) 33 Cal.4th 367, 375.) "In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' [Citations.] Second, a ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' [Citations.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at pp. 376-377.)

b. *Discussion*.

Brown argues there was an abuse of discretion because the trial court's decision was predicated on its faulty recollection that Dr. O'Brien had testified Denesha's injury was among the worst he had ever seen in the emergency room. The Attorney General acknowledges O'Brien never said this. Unfortunately, the trial court's misstatement went uncorrected. However, we agree with the Attorney General's argument this single factor was not critical to the court's denial of *Romero* relief.

Brown concedes the trial court also expressed the following concerns: there were no mitigating factors; Brown had only recently been released from prison and he was still on parole for serious felonies when he assaulted Denesha; at the time of the assault Denesha was pregnant with his child; Brown never accepted responsibility for his crimes. Moreover, there was no doubt Denesha suffered extremely serious injuries. There was overwhelming evidence Brown had punched her very hard in the

23

face multiple times, fracturing her nasal bones, cheek bone and eye socket. Following her hospitalization, Denesha had to undergo a course of treatment by a plastic surgeon. The trial court saw photographs documenting Denesha's injuries. The jury found Brown had inflicted great bodily injury on Denesha.

Brown tries to obscure the fact he never accepted responsibility, asserting: "Taking responsibility means being accountable or answerable for one's conduct. Appellant in addressing the court stated: 'I'm sorry for the hurt and pain I have caused. . . . The jury has found me guilty so I have to be punished.' " (Ellipsis in original.) But the ellipsis in this quotation omits Brown's assertion that "It was truly an accident." We can only say that, truly, Brown did not take responsibility for his actions.

In addition, Brown had sustained the following adult convictions: carrying a loaded firearm in a public place (1996); carrying a concealed weapon (1997); attempted murder and attempted robbery (1997); disorderly conduct (2009).

Given Brown's recidivism, the severity of the injuries he inflicted on his pregnant domestic partner, the fact he was on parole when the crimes were committed, and his refusal to accept responsibility, the trial court plainly did not abuse its discretion by denying his *Romero* motion. (See *People v. Carmony, supra,* 33 Cal.4th at p. 378 [" '[w]here the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance' "].)

3. *Improper calculation of presentence custody credits must be corrected.*

Brown contends, and the Attorney General properly concedes, the trial court miscalculated the presentence custody credits. Brown is entitled to an additional 48 days presentence credit.

The trial court awarded no conduct credits for Brown's 320 days of actual presentence custody. However, on a Three Strikes case involving a violent felony, a defendant is entitled to 15 percent of the conduct credit otherwise available to non-

24

Three Strikes defendants. (See *People v. Caceres* (1997) 52 Cal.App.4th 106, 113 ["We . . . hold that pursuant to section 2933.1, a prisoner convicted of a violent felony listed in section 667.5[**6**] and sentenced under the Three Strikes law or initiative 'shall accrue no more than 15 percent of worktime credit, as defined in Section 2933.' "].)

The judgment will be modified to reflect a total of 368 days presentence credit.

4. *Clerical error in abstract of judgment must be corrected.*

The Attorney General points out the abstract of judgment contains a clerical error. While the trial court properly imposed a $40 court security fee and a $30 court facilities assessment for each of Brown's two convictions, the abstract of judgment reflects only a single set of fees.

The court facilities assessment (Gov. Code, § 70373) and the court security fee (§ 1465.8) "are mandatory." (*People v. Woods* (2010) 191 Cal.App.4th 269, 272.) Section 1465.8 provides for a fee to "be imposed on every conviction for a criminal offense." Government Code section 70373 provides for an assessment to "be imposed . . . for each misdemeanor or felony . . . ." Hence, these fees are to be imposed for each conviction. (*People v. Castillo* (2010) 182 Cal.App.4th 1410, 1415, fn. 3 [regarding § 70373]; *People v. Schoeb* (2005) 132 Cal.App.4th 861, 865 [regarding § 1465.8].)

Here, the trial court properly imposed one court facilities assessment and one court security fee for *each conviction*, but the abstract of judgment reflects only a single assessment and fee for both convictions. We will order the abstract of judgment corrected. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185 [abstract of judgment is not judgment of conviction and does not control if different from trial court's oral judgment; it is proper and important to correct such errors in abstracts of judgment].)

---

**6** Section 667.5, subdivision (c)(8), includes "[a]ny felony in which the defendant inflicts great bodily injury on any person other than an accomplice." Brown was found to have inflicted great bodily injury on Denesha.

## DISPOSITION

The judgment is affirmed as modified. The abstract of judgment must be corrected to properly reflect a total of 368 days presentence custody credit, and the imposition of a court security fee and a court facilities assessment for each conviction. The trial court is directed to forward an amended abstract of judgment to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

KITCHING, J.

ALDRICH, J.

26